UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

PAUL ALLEN ADAMS,

        Plaintiff,

                                      Case No. 18-cv-1468-pp

  v.

CHARLES LARSON, *et al.*,

        Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 45) AND DISMISSING CASE

---

The plaintiff, a former Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. §1983. The court allowed him to proceed on a deliberate indifference claim against defendants Charles Larson, Robert Frank, Candace Whitman, Joe Narance, Kristine DeYoung, Julie Ludwig, Jan Britt, Randall Stephen and Yvette Moore[1] "based on his allegations that they refused to give him a soft food/liquid diet and after-care medications following [an EGD procedure], despite hospital orders to do so, and despite his complaints of pain and an inability to eat." Dkt. No. 10 at 5. The court also allowed him to proceed against inmate complaint examiner Laura Bartow

---

[1] The plaintiff did not know the names of some of the defendants when he filed his complaint, so he used a John and Jane Doe placeholder. On April 1, 2019, the plaintiff filed a motion to identify the Doe defendants as Moore, Britt and Stephen. Dkt. No. 17. Magistrate Judge William Duffin (to whom the court had referred the case for handling pretrial matters) granted the plaintiff's motion a few days later and updated the docket. Dkt. No. 20.

1

"based on his allegations that Bartow initially rejected his emergency complaint that he was not receiving a soft food/liquid diet or his after-care medications." Id.

On October 1, 2019, Bartow, Britt, DeYoung, Frank, Larson, Ludwig, Narance, Stephen and Whitman (the State defendants) filed a motion for summary judgment. Dkt. No. 39. The next day, Moore moved for summary judgment. Dkt. No. 45. Both motions are fully briefed and ready for the court's decision.

## I. RELEVANT FACTS[2]

### A. The Parties and Health Services Procedures

At the time of the events described in the complaint, the plaintiff was incarcerated at Fox Lake Correctional Institution; he was released from prison on March 25, 2020. Dkt. No. 68. Frank worked for the Wisconsin Department of Corrections (DOC) at Fox Lake as an advanced practice nurse prescriber (APNP); Larson was a physician; Whitman was the health services manager; Ludwig was a nurse clinician 4; Narance, Britt, DeYoung and Stephen were nurse clinicians; and Bartow was an institution complaint examiner. Dkt. No.

---

[2] The plaintiff filed his own set of proposed facts. Dkt. No. 63. Most of the plaintiff's proposed facts and his responses to the defendants' proposed facts do not comply with the Federal Rules of Civil Procedure or the court's local rules. See Fed. R. Civ. P. 56; Civil L.R. 56(b)(2)(B)(ii). Many numbered paragraphs contain multiple facts, are argumentative, contain inadmissible hearsay and are only haphazardly supported by the record. The court will consider the plaintiff's assertions "only to the extent they are clearly and obviously supported by citations to the [] record" and cite admissible evidence. Jenkins v. Syed, 781 Fed. App'x 543, 545 (7th Cir. 2019); Carlisle v. Deere & Co., 576 F.3d 649, 655 (7th Cir. 2009) (explaining that, to defeat a motion for summary judgment, a party "may rely only on admissible evidence").

2

41 at ¶2. Moore is a registered nurse; she works for Cell Staff LLC and was assigned to Fox Lake at the time of the events in this case. Dkt. No. 47 at ¶¶3, 5.

Nurses (the position Narance, Britt, Stephen and DeYoung held) and advanced care providers, including physicians (the position Dr. Larson held), nurse practitioners (the position Frank held) and physician assistants provide medical care for prisoners. Dkt. No. 41 at ¶3. Health service managers (the position Whitman held) and nurse clinician 4s (the position Ludwig held), generally are not involved in prisoners' medical care. Id. Only advanced care providers can write prescriptions for medications and approve recommendations from offsite providers. Id. at ¶4. Health service managers, nurse clinician 4s and nursing staff defer final treatment decisions and plans to advanced care providers and are authorized to provide only non-prescription medications such as Tylenol. Id. at ¶¶4, 6.

When an offsite provider makes a recommendation to health services, nursing staff transcribe the recommendation for review by the advanced care provider, who either approves the recommendation or makes adjustments. Dkt. No. 41 at ¶5. Nursing staff are not authorized to alter an offsite provider's recommendations. Id.

When an inmate has a medical concern, wishes to communicate with medical staff and/or wants to be seen by health services, he may submit a health services request form to health services. Dkt. No. 41 at ¶7. A registered nurse triages each request (regardless of the identity of the person to whom the

prisoner addresses his request) and responds within twenty-four hours. Id. at ¶¶7, 10. Responses include a nurse notifying the prisoner whether he is scheduled to be seen, whether his request has been referred to another staff member, whether his request has been forwarded for copies or a record review and/or whether education materials are attached. Id. at ¶9. Responding nurses also may provide written comments. Id.

B.    The Plaintiff's EGD and Aftercare

On September 7, 2017, the plaintiff traveled offsite to UW Health for an esophagogastroduodenoscopy[3] (EGD) to be performed by Dr. Soni. Dkt. No. 41 at ¶13. After Dr. Soni completed the procedure, the plaintiff traveled back to Fox Lake. Id. at ¶14. Upon his return, health services received copies of the offsite service request and report (to which Dr. Soni had added his aftercare recommendations), a copy of Dr. Soni's progress notes and a printout titled "Home Care after Your Endoscopy with Dilation or Esophageal Banding," which UW Health had created. Id. at ¶15.

The offsite service request and report has a section titled "Recommended Plan of Care," where the offsite provider can make notes. Dkt. No. 44-1 at 8. Several handwritten recommendations appear on the form, including: "Magic mouthwash x3–4 days twice a day;" "EGD 3–4 weeks;" "Soft diet today." Id.;

---

[3] According to Johns Hopkins Medicine, an EGD is an endoscopic procedure that allows a doctor to examine a patient's esophagus, stomach and duodenum (part of the small intestine). EGDs are outpatient procedures and are popular diagnostic options because patients generally tolerate them well and they cause minimal discomfort. Available at https://www.hopkinsmedicine.org/ gastroenterology_hepatology/clinical_services/basic_endoscopy/esophagogastr oduodenoscopy.html (last visited May 31, 2020).

4

Dkt. No. 41 at ¶16. Moore transcribed Dr. Soni's handwritten recommendations so that Dr. Larson could review them; Dr. Larson signed off on the recommendations. Dkt. No. 41 at ¶19. Britt reviewed and signed off on Dr. Larson's orders the next day. Id. at ¶45. Britt did not examine the plaintiff. Id.

The offsite service request and report also contained the handwritten comment: "See attached note." Dkt. No. 44-1 at 8. This was a reference to UW Health's printout titled "Home Care after Your Upper Endoscopy with Dilation or Esophageal Banding." Id. at 15-16. This printout includes a section titled "What to Expect" following an EGD and gives patients information about precautions they should take when they get home. Id. at 15. One of the seven bullet points in that section says: "Your diet should be liquids and soft foods. Avoid bread, toast, nuts, and meats. After two days you may try solid foods, chewing them very well to test whether you can swallow safely." Id. at 15.

The plaintiff asserts that Dr. Soni has performed at least five EGDs on him during which he banded varices,[4] and Dr. Soni's aftercare orders regarding the length of time he should have a soft diet all have been the same. Dkt. No. 62 at ¶13. The plaintiff asserts that Dr. Soni "never wrote on his aftercare orders the soft diet should be for one day. It was Moore who wrote that in her own identifiable hand-writing." Id. The plaintiff provides no admissible evidence to support this assertion; he relies on his and another inmate's analysis of

---

[4] "Esophageal varices are abnormal, enlarged veins in the" esophagus. https://www.mayoclinic.org/diseases-conditions/esophageal-varices/symptoms-causes/syc-20351538.

5

Moore's and Dr. Soni's handwriting, his opinion that the defendants have shown a propensity to lie and alleged statements (which are hearsay) that the plaintiff says Dr. Soni made to him. Id. at ¶¶15–17; Dkt. No. 65 at ¶25. Moore denies that she added comments to Dr. Soni's handwritten orders. Dkt. No. 67 at 2, n.1; Dkt. No. 47 at ¶¶8–9.

According to Moore, she examined the plaintiff when he returned to Fox Lake after his EGD. Dkt. No. 41 at ¶18. Moore's notes from that examination indicate that the plaintiff stated he had some pain but no questions or concerns. Id. The plaintiff asserts that he asked if the soft diet order would be followed. Dkt. No. 62 at ¶18. He explained that he wanted a soft diet until he notified the kitchen that he no longer needed it. Id. According to the plaintiff, Moore told him that she "didn't think he needed it because [he's] been through this so many times before, that [he] should just be careful in selecting what [he] cho[oses] to eat." Id.

Moore asserts that she gave the plaintiff a soft diet that night, as recommended by Dr. Soni and adopted by Dr. Larson. Dkt. No. 47 at ¶9. The plaintiff states that he did not receive a soft diet that night; instead, he received two peanut butter sandwiches, tortilla chips and raw carrots. Dkt. No. 62 at ¶¶9, 14. He states that someone (it is unclear who) told him that Moore would call the main kitchen and have them send a soft diet, but the plaintiff says he never received it. Id. The plaintiff asserts that the morning after the EGD he received the general population diet, including toast and hard cereal. Id. at ¶18.

On September 8, 2017—the day after the procedure—the plaintiff filed an inmate complaint, to which he attached UW Health's aftercare printout. Dkt. No. 65 at ¶1; Dkt. No. 44-2 at 11–12. Bartow, the inmate complaint examiner, received the complaint that same day and rejected it, directing the plaintiff to try to resolve his concern with Whitman. Dkt. No. 65 at ¶1.

According to the plaintiff, he talked to Whitman a couple of days later—on September 10 or 11, 2017—and told her that he was in pain, spitting up blood and could not eat. Dkt. No. 62 at ¶23. According to the defendants, health services first received a health services request from the plaintiff about his diet and other complaints on September 11, 2017. Dkt. No. 41 at ¶21. They explain that the plaintiff addressed his health services request to Warden Hepp (who is not a defendant). Id. The plaintiff states that he wrote the health services request to Hepp on September 8, 2017, and that it was acknowledged by Hepp a few days later, on September 11. Dkt. No. 62 at ¶21. The plaintiff says that he also made "constant daily complaints to every shift/unit s[e]rge[a]nt(s) until they told [him] that HSU, the main kitchen repe[a]tedly told the[m] they would not do anything about it." Id. The plaintiff provides no evidence that the officers conveyed his complaints to any of the defendants.

The plaintiff asserts that he met with Ludwig in health services on about September 13, 2017, just under a week after the EGD. Dkt. No. 62 at ¶34. He says he told Ludwig that when he previously had varices banded, he was allowed to have a soft diet for a week or two until he felt he no longer needed it. Id. He asserts he explained to her that in the past, he would tell unit sergeants

7

that he no longer needed a soft diet, and they would communicate that to the kitchen. Id. The plaintiff states that Ludwig disputed what the plaintiff was telling her, but said she would look into it because she had recently been put in charge of retraining health services staff. Id.

On September 14, 2017, a week after the plaintiff's EGD, health services received a health services request from the plaintiff with several complaints, including complaints about his EGD aftercare and the soft diet order. Dkt. No. 41 at ¶22. Unidentified nursing staff responded to the plaintiff that same day and forwarded the request to Whitman for review. Id. at ¶23. Whitman was on medical leave from September 12–18, 2017, so she could not review the health services request. Id. at ¶24. The request was forwarded to another staff member, which is how Narance came to respond to the request. Id. at ¶25.

Narance sent a memo to the plaintiff that same day. Dkt. No. 41 at ¶31. Narance explained that he had reviewed the plaintiff's health service request and reviewed his chart. Id. He explained that the DOC provider (Dr. Larson) had entered an order for a one-day soft diet and that the plaintiff was scheduled with the doctor for a follow-up to address his concerns. Id. Narance also noted that he had made a referral to dietary to verify the plaintiff's diet and nutrition plan of care. Id. This was Narance's only involvement; he was not involved with the plaintiff's EGD aftercare treatment before writing this memo, and he was not involved with his EGD aftercare treatment after writing this memo. Id. at ¶33.

The plaintiff refiled his inmate complaint on September 15, 2017. Id. at ¶2; Dkt. No. 44-2 at 11 (containing two "Received" stamps; one dated September 8 and one dated September 15). It appears that, when resubmitting his inmate complaint, the plaintiff may have added information about the efforts he made to informally resolve his issues after he initially filed his inmate complaint, because the plaintiff dated that section "9/13/17." Id. at 11.

According to the defendants, Whitman's only other involvement was when she was contacted by Bartow about the plaintiff's inmate complaint regarding not receiving a soft diet following his EGD. Dkt. No. 41 at ¶26. Whitman explains that she reviewed the plaintiff's medical chart, which included Dr. Soni's recommendation that the plaintiff receive a "soft diet today." Id. at ¶27. Whitman confirmed that this was the order that was written by the nurse (Moore) and signed off on by the advanced care provider (Dr. Larson). Id. Accordingly, she did not believe any further action was necessary. Id. at ¶29. Whitman acknowledges that the printed discharge education stated "after two days you may try solid foods," but she notes that was not what Dr. Soni handwrote on his order. Id. The plaintiff insists, without evidence, that Moore, not Dr. Soni, wrote "soft diet today." Dkt. No. 62 at ¶27.

In the course of her investigation, Bartow discovered that no one ever notified food services of the soft diet order for September 7, 2017. Dkt. No. 41 at ¶29; Dkt. No. 44-2 at 2. She recommended affirming the plaintiff's inmate complaint. Dkt. No. 44-2 at 2. The plaintiff explains that it makes sense that no one communicated the order to the kitchen staff. Dkt. No. 62 at ¶29. He

9

says he arrived back at Fox Lake at about 6 or 6:30 p.m., and, by that time, the kitchen was closed. Id. The plaintiff explains that a one-day diet order would have expired before he was even back from his procedure, making it impossible to communicate anything to the kitchen. Id. The inmate complaint examiner suggested that Whitman follow up with staff to address why the order was not properly processed and communicated in order to avoid similar oversights in the future. Dkt. No. 41 at ¶30.

A couple of days later, on September 16, 2017 (about nine days after the plaintiff's EGD), Ludwig met with the plaintiff during evening medication pass to discuss the plaintiff's health services request with him. Dkt. No. 41 at ¶34. According to Ludwig, the plaintiff was upset that he had received a soft diet for only one day. Id. at ¶35. The plaintiff said he had complained to his unit sergeant, who had tried for a couple of days to resolve the issue. Id. at ¶36. Ludwig states that health services has no record of anyone from the plaintiff's housing unit contacting health services about his diet. Id. The plaintiff disputes that there is no record of a contact; he references emails and states that he named three unit sergeants in his health services request, but he provides no admissible evidence to demonstrate that prison staff relayed the plaintiff's complaints to any of the defendants. Dkt. No. 62 at ¶36.

Ludwig states that she apologized for inconsistencies between UW Health's aftercare printout and the treatment Dr. Larson ordered. Dkt. No. 41 at ¶37. She explained to the plaintiff that Moore transcribed Dr. Soni's recommendations. Id. Ludwig says that she told the plaintiff that she planned

10

to use this situation as a teaching example. Id. at ¶38. Ludwig explains what she meant by that: she would have the treatment providers be more mindful of the information contained in generic aftercare printouts versus particular orders from the offsite providers, so that, if there were differences between the two, health services could discuss the differences with the patient to avoid confusion. Id. Ludwig clarifies that she did not believe that the institution providers had made a mistake. Id. at ¶39. She believed that Moore had written the exact care recommended by Dr. Soni. Id.

The plaintiff remembers his conversation with Ludwig differently. Dkt. No. 62 at ¶¶37-41; Dkt. No. 65 at ¶21. The plaintiff asserts that Ludwig apologized for Moore's mistake and admitted that she was wrong and that the plaintiff should have received the soft diet as outlined in the general aftercare orders. Dkt. No. 62 at ¶¶37-38.

The plaintiff notes that Dr. Soni's handwritten order says, "See Note," and the UW Health printout recommends, among many other things, that a patient eat a soft diet for a minimum of two days. Dkt. No. 62 at ¶40. Ludwig emphasizes that the UW Health printout is a generic form given to all patients and that a provider's specific order for a particular patient supersedes whatever is in the printout. Dkt. No. 41 at ¶40.

Ludwig offered to contact UW Health Gastrointestinal Specialists for additional recommendations about the plaintiff's diet. Dkt. No. 41 at ¶41. She explains that the plaintiff did not state any other concerns at that time, so she did not believe additional action was necessary. Id. Ludwig explains that the

11

September 16 meeting was her only involvement in the plaintiff's EGD aftercare. Id. at ¶42. The plaintiff clarifies that he spoke with Ludwig in health services a few days before this meeting, and he states that his unit sergeants called her, although he provides no admissible evidence demonstrating that she received those calls. Dkt. No. 62 at ¶42. Health services did not receive any other complaints from the plaintiff and the plaintiff had no additional appointments related to the soft diet order after September 16. Id. at ¶44.

## II.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    The Plaintiff's Claim and the Defendants' Personal Involvement

The court allowed the plaintiff to proceed against the defendants based on his allegations that they refused him a soft diet following his EGD despite recommendations in the UW Health printout that patients eat a soft diet for at least two days following the procedure. The court also allowed him to proceed against the defendants based on his allegations that they failed to give him medications that the offsite provider had prescribed to promote healing and alleviate pain.

In his response to the defendants' motions for summary judgment, the plaintiff asserts that he "choked up on any foods he [ate] for the next year" and that in November 2018, he was diagnosed with "esophag[e]al cancer in the exact same area where he had been choking on food for the past year." Dkt. No. 61 at 1. He speculates that, "[a]s a direct result of the defendants['] deliberate indifference[, he] suffered pain, and ongoing choking and ended up getting cancer." Id. at 2.

This is not what the plaintiff alleged in his complaint. In the complaint, the plaintiff alleged that he was "forced to go without food," that he "was being

13

den[i]ed food" and that he was "starving, in pain." Dkt. No. 1 at 3. Despite the plaintiff's more recent assertion that "[t]his case has nothing to do with [him] not being fed enough food," dkt, no. 61 at 2, that is precisely what his complaint alleged. The plaintiff also now states that he had to choke down his food for a full year and that he coughed up blood while eating, yet the evidence demonstrates that he did not raise any complaints about the lack of a soft diet after September 16, less than ten days following the procedure. The plaintiff has provided no evidence from which a jury could reasonably conclude that the defendants' failure to provide him with a soft diet for two days following a routine, outpatient procedure caused him to choke on his food for a year or to develop cancer. The court will not address those allegations further.

The evidence establishes, among other things, that: 1) The plaintiff returned from his EGD with a report containing handwritten recommendations and a printout from UW Health with general recommendations; 2) Moore transcribed the handwritten recommendations the same day the plaintiff returned to Fox Lake; 3) Dr. Larson reviewed and approved the recommendations Moore had transcribed (he clarified the ingredients for magic mouthwash the following day); and 4) Britt reviewed and approved Dr. Larson's order the day after the EGD.

Moore asserts that Dr. Soni's handwritten order stated "soft diet today," so that's what she transcribed and, after Dr. Larson approved the order, that's what she entered. The plaintiff asserts that Moore is lying—Dr. Soni did not

handwrite that recommendation. He says Moore added the recommendation after the fact as a way of covering up her wrongdoing.

The plaintiff has provided no evidence from which a jury could reasonably reach that conclusion. The plaintiff and another inmate say that the handwriting doesn't match, but this is speculation, which is not enough to create a triable issue of fact at summary judgment. See Williams v. Raemisch, 545 F. App'x 525, 529 (7th Cir. 2013) ("speculation may not be used to manufacture a genuine issue of fact"). The plaintiff and this unnamed inmate are not handwriting experts. While the words "soft diet today" are slightly larger than other words on the form, they are not (to this court's untrained eye) otherwise noticeably different. See Dkt. No. 44-1 at 8. There is no evidence from which a factfinder could reasonably conclude that the recommendation at issue was written by a different person.

The plaintiff also asserts that he spoke to Dr. Soni next time he saw him and that Dr. Soni confirmed that he did not write "soft diet today." But the plaintiff's representations of what Dr. Soni told him are hearsay and are not admissible to create a triable issue of fact. See Maddox v. Jones, 370 F. App'x 716, 720 (7th Cir. 2010) ("inadmissible hearsay . . . may not be relied upon to defeat summary judgment") (citations omitted). The plaintiff could have submitted an affidavit or declaration from Dr. Soni—the plaintiff says he spoke to Dr. Soni in person—but he didn't submit any documentation. He bears the consequence of his failure to provide the court with admissible evidence. See Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 901 (7th Cir. 2003)

("summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events" (citations and internal quotation marks omitted)). Accordingly, the court will not consider the plaintiff's assertions that the recommendation "soft diet today" was written by Moore and not Dr. Soni.

The plaintiff says he *never* received a soft diet, not even for the one day ordered by Larson. Someone (it is unclear who) failed to communicate Dr. Larson's order to the kitchen. But the plaintiff clarifies that, even if the responsible person *had* communicated the order, he still wouldn't have received a soft diet because the kitchen was closed by the time he returned to the institution. The plaintiff explains that the kitchen closes at 5 p.m. and "NO more meals are ever served af[ter] that time. That is Fox Lake policy." Dkt. No. 62 at ¶29.

There is no evidence suggesting that the defendants had control over when the plaintiff returned to the institution, nor is there evidence suggesting that they could have reopened the kitchen to provide the plaintiff with a soft diet after his return. Even viewing the facts in the light most favorable to the plaintiff, the plaintiff received what was available—a premade bagged meal that, unfortunately, contained foods the plaintiff asserts he could not eat. To the extent the plaintiff argues the defendants should have anticipated (from his prior EGDs) that he would need a soft diet and therefore that they should have preordered a soft diet before his return, the defendants' failure to do so would be negligent at most, and negligence does not constitute deliberate indifference

16

or a violation of the Constitution. <u>McGowan v. Hulick</u>, 612 F.3d 636, 640 (7th Cir. 2010).

Because none of the defendants were responsible for the plaintiff not receiving a soft diet after he returned to the institution, they cannot be held liable on that basis. <u>See</u> <u>Vance v. Peters</u>, 97 F.3d 987, 991 (7th Cir.1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (internal quotation marks and citation omitted).

The above demonstrates that the scope of the plaintiff's claim is narrower than his response to the defendants' motions suggests. This case is not about the defendants denying the plaintiff a soft diet altogether, or about Moore forging documents, or about the plaintiff having difficulty eating for a year and developing cancer. This case is about (a) whether the defendants violated the Constitution when Dr. Larson adopted Dr. Soni's handwritten recommendation that the plaintiff receive a soft diet for one day when that recommendation conflicted with a generic recommendation that EGD patients eat a soft diet for two days and (b) whether the defendants violated the Constitution when the plaintiff did not immediately receive medication Dr. Larson ordered upon Dr. Soni's recommendation. The court concludes that the defendants did not violate the Constitution.

Case 2:18-cv-01468-PP   Filed 06/01/20   Page 17 of 27   Document 69

C.    The Deliberate Indifference Standard under the Eighth Amendment

"[T]he Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). The court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." Id. (quoting Petties v. Carter, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc)).

1.    *Objectively Serious Medical Condition*

The defendants argue that the plaintiff has not presented evidence to create a triable issue on whether his need for a soft diet qualifies as an objectively serious medical condition. Dkt. No. 40 at 15. According to the Seventh Circuit, "[T]he following circumstances [are] indications that a prisoner has a serious medical need: The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Hayes v. Snyder, 546 F.3d 516, 522-23 (7th Cir. 2008) (citations and internal quotation marks omitted).

18

Both Dr. Soni and Dr. Larson prescribed a soft diet for the plaintiff following his EGD (in other words, they determined his post-EGD condition was worthy of treatment), and the plaintiff explains that he had trouble swallowing solid/hard foods (a daily activity) because he was in a lot of pain. The court finds that a reasonable jury could conclude that the plaintiff suffered from an objectively serious condition following his EGD.

### 2. *Deliberate Indifference to the Plaintiff's Condition*

Deliberate indifference requires "more than negligence and approaches intentional wrongdoing." Goodloe v. Sood, 947 F.3d 1026, 1030 (7th Cir. 2020) (citations omitted). To survive summary judgment, a plaintiff must present evidence from which a jury could reasonably conclude that "the prison official acted with a sufficiently culpable state of mind, meaning the official knew of or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." Id. at 1030-31 (citations and internal quotation marks omitted).

### a. Medication

The plaintiff claims that the defendants were deliberately indifferent to his condition because they failed to provide him with recommended medication that Dr. Soni had prescribed to promote healing and alleviate pain. It's not clear to the court what "medication" the plaintiff argues Dr. Soni recommended and that the defendants failed to provide. The only handwritten recommendation from Dr. Soni was for magic mouthwash. Moore transcribed that recommendation the day the plaintiff returned from his EGD, Dr. Larson adopted the recommendation that same day and Britt approved it the next day.

19

The plaintiff asserts only that the defendants "sent these meds back." Dkt. No. 61 at 1. He says he complained about pain and choking. Id. Dr. Larson explains that he clarified the ingredients of the magic mouthwash the day after the plaintiff returned from the EGD. The plaintiff confirms that he received the medication within forty-eight hours. Id.

No jury could conclude from this sequence of events that the defendants were deliberately indifferent to the plaintiff's condition. Moore immediately transcribed the recommendation and Dr. Larson immediately adopted it. It's unclear what prompted Dr. Larson to clarify his order for the magic mouthwash and specify the ingredients, but he did so the next day. The plaintiff confirms that he received the mouthwash the following day. The defendants' prompt responses are the opposite of deliberate indifference. They are entitled to summary judgment on this claim.

b.     Dr. Larson

With regard to the soft diet issue, Dr. Larson's involvement is limited to his reviewing and approving Dr. Soni's handwritten recommendation that the plaintiff receive a soft diet for the remainder of the day following his EGD. The plaintiff argues that Larson's ordering a soft diet for such a limited amount of time amounts to cruel and unusual punishment. According to the plaintiff, after other EGDs he had always been prescribed a soft diet for at least two days and had been permitted to notify the kitchen (by telling officers) when he was ready to transition to solid foods. The plaintiff argues that Dr. Larson should have deferred to the generic instructions in the UW Health printout regarding

20

the timing for a soft diet rather than adopting Dr. Soni's handwritten recommendation.

Dr. Soni is a specialist who, as the plaintiff explains, has performed many EGDs on the plaintiff. He is familiar with patients' recovery times and capabilities following an EGD. No reasonable jury could conclude that Dr. Larson was deliberately indifferent to the plaintiff's recovery when he decided to adopt Dr. Soni's handwritten recommendation regarding the length of time the plaintiff should be on a soft diet. The two recommendations differed by a single day—one day (as Dr. Soni recommended) and two days (as the generic handout recommended). No jury could reasonably conclude that Dr. Soni's recommendation should have raised questions or concerns in Dr. Larson's mind.

While Dr. Larson would have been required to be responsive to the plaintiff's complaints that he continued to be unable to eat solid foods in the days following the EGD, the plaintiff presents no evidence suggesting that Dr. Larson knew about the plaintiff's complaints. The plaintiff asserts that he told officers on his unit and that they relayed his complaints to health services, but the defendants assert that health services has no record of officers on the plaintiff's unit contacting it about the plaintiff's difficulties. The plaintiff provides no evidence from which a jury could reasonably conclude that health services generally or Dr. Larson in particular knew that, in the days immediately following the EGD, the plaintiff continued to have difficulty eating. Because there is no evidence that Dr. Larson knew about the plaintiff's

21

challenges, no reasonable jury could conclude that he was deliberately indifferent to those challenges.

### c.  Moore and Britt

"As a matter of professional conduct, nurses may generally defer to instructions given by physicians, but that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." Holloway v. Delaware Cty. Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012) (citations and internal quotation marks omitted). As the court has explained, Dr. Larson was not deliberately indifferent when he adopted Dr. Soni's recommendation to prescribe a soft diet for one day instead of two. There is no evidence from which a jury could reasonably conclude that either nurse should have known that a one-day soft diet order would put the plaintiff at risk. There also is no evidence to support a conclusion that Moore or Britt knew that the plaintiff continued to have difficulty eating in the days immediately following his EGD. Moore and Britt are entitled to summary judgment.

### d.  Whitman, Narance and Ludwig

Whitman, Narance and Ludwig did not provide direct care for the plaintiff; they were not involved in or responsible for Dr. Larson's order for a one-day soft diet. Their only responsibilities were to investigate and respond to the plaintiff's complaints, not to micromanage or interfere with the plaintiff's course of treatment. To create a triable issue of fact, the plaintiff needed to offer evidence that these defendants had reason to doubt that Dr. Larson based

22

his course of treatment on something other than medical judgment. <u>Heard v.</u> <u>Tilden</u>, 774 F. App'x 985, 988–89 (7th Cir. 2019) (citations omitted). The plaintiff has not provided such evidence.

The evidence shows that each of these defendants appropriately investigated the plaintiff's complaints and discovered that Dr. Larson had simply adopted the recommendation of Dr. Soni. Whitman reviewed Dr. Larson's order and relevant medical records and subsequently reported her findings to the inmate complaint examiner. Narance informed the plaintiff via memo that he had an appointment scheduled with his provider to discuss his concerns and that he had made a referral to dietary to assess the appropriateness of the plaintiff's diet. Ludwig spoke to the plaintiff, apologized for confusion, and offered to contact UW Health Gastrointestinal Specialists for additional recommendations about his diet. When the plaintiff declined that offer, she decided nothing further was required.

Given these responses, no jury could reasonably conclude that they were deliberately indifferent to the plaintiff's complaints about the medical care he was receiving. They are entitled to summary judgment.

e.    Bartow

The plaintiff asserts that Bartow was deliberately indifferent to his condition because she rejected his emergency grievance the day after his EGD and directed him to speak first to Whitman to informally resolve his issue. The plaintiff states that he spoke to Whitman on September 10 or 11, 2017, three to four days after his EGD procedure (recall that the generic recommendations

23

that the plaintiff argues Dr. Larson should have adopted recommended a soft diet for *two* days). He then refiled his inmate complaint, and Bartow received it on September 15. There is no dispute that Bartow fully investigated the refiled inmate complaint—she recommended that it be affirmed after confirming that the plaintiff did not receive a soft diet on the night of September 7, after the plaintiff returned from his EGD.

The Seventh Circuit has explained that, "[o]ne can imagine a complaint examiner doing her appointed tasks with deliberate indifference to the risks imposed on prisoners." Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009). It clarified, however, that liability will arise only when an inmate complaint examiner is shown to have refused to do her job; there is no liability when the evidence supports a finding that she "carried out her job exactly as she was supposed to." Id.

Wis. Admin. Code DOC §310.07(1) states: "Prior to filing a formal complaint, an inmate shall attempt to resolve the issue by following the designated process specific to the subject of the complaint. The [inmate complaint examiner] may request inmates to provide evidence of having followed the specified process." Bartow rejected the plaintiff's complaint because he did not provide evidence that he had tried to resolve his issue before he filed his inmate complaint. She directed him to talk to Whitman and, if his issue was not resolved, to refile his complaint. In short, "she carried out her job exactly as she was supposed to." Burks, 555 F.3d at 595. No jury could

24

reasonably conclude that she was deliberately indifferent to the plaintiff's condition. She is entitled to summary judgment.

### f. DeYoung, Frank and Stephen

DeYoung, Frank and Stephen were not involved in deciding the plaintiff's treatment following his EGD. The plaintiff states that they were aware of his complaints, but even assuming they were (and the plaintiff has provided no evidence that the complaints he made to his unit officers were communicated to anyone at health services, let alone to these defendants), they had no authority or responsibility to intervene in his care.

As noted earlier, for a prison official to be personally liable, he must have participated in some way in the alleged constitutional violation. Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (internal quotation marks and citation omitted); see also Palmer v. Marion Cty., 327 F.3d 588, 594 (7th Cir. 2003). Consistent with this reasoning, the Seventh Circuit has explained that,

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules . . . along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.

Burks, 555 F.3d at 595.

As demonstrated by the evidence, the plaintiff had numerous avenues to register his complaints about his health care. He filed multiple health service requests and an inmate complaint, all of which were fully investigated and responded to. The Constitution does not require DeYoung, Frank and Stephen—who had no direct responsibility for treating the plaintiff following his EGD and no direct responsibility for investigating the plaintiff's complaints about his treatment—to abandon their duties to investigate the plaintiff's complaints. As the Seventh Circuit has noted, one feature of constitutional tort law "is that there is no general duty of rescue." <u>Burks</u>, 555 F.2d at 596. These defendants are entitled to summary judgment.

## III. CONCLUSION

The court **GRANTS** the defendants' motions for summary judgment. Dkt. Nos. 39, 45. The court **DISMISSES** this case and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. <u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief

Case 2:18-cv-01468-PP   Filed 06/01/20   Page 26 of 27   Document 69

from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 1st day of June, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**